# DOHERTY *v.* NORTHERN PACIFIC RAILWAY COMPANY.

ERROR TO THE SUPREME COURT OF THE STATE OF WISCONSIN.

No. 121. Argued January 26, 29, 1900. — Decided April 16, 1900.

The eastern terminus of the Northern Pacific Railroad, which was constructed under the powers conferred upon that Railroad Company by the act of July 2, 1864, c. 217, 13 Stat. 365, was at Ashland in Wisconsin, and that company acquired a right of way over public lands in Wisconsin, including the land in question in this case.

In the Superior Court of Douglas County, Wisconsin, in November, 1896, Andrew Doherty filed a petition asking for the appointment of commissioners to appraise certain real estate taken by the Northern Pacific Railway Company for a portion of its line passing through property alleged to belong to the petitioner.

The petition alleged that Doherty was and had been since November 8, 1882, the owner in fee simple of the north one half of the southwest quarter of section 4, township 47, range 11 west, in Douglas County, Wisconsin; that the Northern Pacific Railroad Company was a corporation duly authorized by the laws of the United States to construct and maintain a line of railway from a point on Lake Superior, in the States of Wisconsin or Minnesota, to some point on Puget Sound, in the State of Washington; that some time during the year 1883, the said company had unlawfully laid its railroad track upon a portion of petitioner's land, and had unlawfully entered upon and appropriated the same, without the consent or authority of petitioner, and had been in possession thereof ever since until about August 31, 1896; that on or about the last mentioned date all the property, effects, rights and franchises of the Northern Pacific Railroad Company had been transferred and sold to and purchased by the Northern Pacific Railway Company, and said railroad has ever since been operated and owned by the said Northern Pacific Railway Company, which the petition alleged to be a domestic corporation, duly authorized by its charter and the laws of the State of Wisconsin to maintain and operate the line of railway before mentioned; that neither the said Northern Pacific Railroad Company, nor its successor, the Northern Pacific Railway Company, has acquired title to said land, or made any attempt to acquire title thereto by purchase, eminent domain or otherwise. The petition further alleged that the value of the land so taken and the damages occasioned by the taking thereof were less than five million dollars and more than one hundred thousand dollars. Wherefore an order was prayed that commissioners be appointed to ascertain and appraise the compensation to be made, etc.

To this petition the Northern Pacific Railway Company made answer asserting title by virtue of the grant of right of way by section 2 of the act of Congress of July 2, 1864, to the Northern Pacific Railroad Company, and of the purchase of the interest of the last named company, etc.

The essential facts in the case were settled by a stipulation in writing, substantially as follows:

"On July 2, 1864, the land in question was public land of the United States. On November 8, 1882, the petitioner Doherty made a homestead entry thereof, and thereafter complied with the homestead laws and received a patent from the United States purporting to convey the lands February 6, 1890. In December, 1885, the Northern Pacific Railroad Company took possession of the strip in controversy and constructed a railroad upon it, and remained in possession, operating the railroad, until August 31, 1896, when all the property, rights and franchises of said railroad company were sold to the appellant, the Northern Pacific Railway Company, a Wisconsin corporation, which is duly organized to operate said railroad, and has occupied said strip for railroad purposes. The Northern Pacific Railroad Company, of which the appellant is the successor in interest, was organized by and obtained its rights under an act of Congress approved July 2, 1864, 13 Stat. 365, c. 217, entitled An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget's Sound on the Pacific coast by the northern route. By the first section of this act a corporation created thereby was authorized to lay out and construct a continuous railroad and telegraph line, beginning at a point on Lake Superior in the State of Minnesota or Wisconsin; thence westerly upon the most eligible route as shall be determined by said company within the United States and north of the forty-fifth degree of latitude to some point on Puget's Sound. By the second and third sections of the same act the right of way through the public land of the United States was granted to said railroad company, its successors and assigns, for the construction of the line, and it was also provided that if its route should be found to be upon the same general line as the route of another railroad which

owned a previous land grant from the United States, the amount of said previous land grant should be deducted from the amount granted by this act, provided that the railroad owning the previous grant might assign its interest to the Northern Pacific Railroad Company, or might consolidate, confederate and associate with said company upon the terms named in the first section of the act. The lands granted to the Northern Pacific Railroad Company by the act amounted to ten alternate sections per mile on each side of the line within the States and twenty alternate sections in the Territories, with a ten-mile indemnity limit, and by resolution of Congress, May 31, 1870, an additional indemnity belt ten miles in width was created on each side of the line. This act was accepted by the company within the time required by law. The act also required the company to procure legislative consent of the States through which it was to run before its construction, and in the year 1865 the legislatures of Minnesota and Wisconsin gave such consent, the Minnesota act providing that if the eastern terminus of the road should be located east of the eastern boundary of Minnesota, then that the company should construct or cause to be constructed a railroad from its main line to the navigable waters of Lake Superior at some point within the State of Minnesota.

"In 1870 the company located its general route from the mouth of the Montreal River in Wisconsin, across Wisconsin and Minnesota to a point on the Red River of the North near Fargo, and transmitted a map showing this location August 13, 1870, to the Secretary of the Interior. This map showed the proposed general route to commence at the mouth of the Montreal River, thence a little south of west upon a direct line to a point directly south of and about six miles distant from the south end of Chequamegen Bay; thence a little north of west upon a direct line crossing the state boundary between Wisconsin and Minnesota, at or near the point where the St. Louis River becomes such boundary. Upon receipt of this map the Secretary of the Interior transmitted it to the Land Commissioner, with instructions to withdraw from sale, homestead and preëmption all odd-numbered sections of land within twenty

miles of the line within both States. This order was complied with by the Land Commissioner by directions given to the district land officers at Bayfield, Wisconsin. Such withdrawals were made and the price of the even-numbered sections was raised to $2.50 per acre, and thereafter large quantities of such land were sold by the Government at the rate of $2.50 per acre. In 1882 a map of definite location of said railroad from a point upon the St. Paul and Duluth Railroad, now called Thomson Junction, eastward to a point in section 15, township 47, north of range 2 west, in the State of Wisconsin, was prepared and approved by the directors and certified and forwarded to the Secretary of the Interior. The line of definite location laid down on this map followed substantially the line of general location upon the prior map, but it turned to the north and touched Superior, and also Ashland, and stopped some ten miles west of the mouth of the Montreal River. Upon receipt of this map of definite location the Land Commissioner, by direction of the Secretary of the Interior, adjusted the land grant in accordance with it, and prepared diagrams showing the limits of the grant and indemnity belts, and transmitted such diagrams to the district land officers with the proper directions as to the withdrawal of lands, which were complied with.

"August 2, 1884, the directors of the Northern Pacific Railroad Company adopted a resolution fixing the eastern terminus of the railroad at the city of Ashland, which resolution was duly certified and transmitted to the Commissioner of the General Land Office, December 3, 1884. Thereafter the Commissioner prepared a diagram showing the final eastern terminus of the line at Ashland, and sent the same to the district officers at Bayfield, with instructions to adjust the grant on this basis. The point so fixed is on the line of definite location of July 6, 1882, but about twelve miles west of the east end of that line. The Northern Pacific Railroad Company constructed a continuous line of railroad from the city of Ashland to Puget's Sound, in all respects in accordance with its act of incorporation, and the whole line has been duly accepted by the President of the United States, as provided in that act. That portion of the road extending east from Thomson Junction was

constructed upon the line of definite location shown in the map of 1882, and was so constructed during the years 1881, 1882, 1883 and 1884.

"The first section extended from Thomson Junction to Superior, and was examined and reported favorably upon by commissioners in 1882, and the recommendations were approved by the President, September 16, 1882; the second section, extending from Superior to the Brule River, was constructed in the latter part of 1883, and crossed the land in question here, and was approved in like manner January 31, 1884; the third section extended from the Brule River to Ashland, and was approved in like manner February 18, 1885. It appears further that, March 6, 1865, one Josiah Perham, then the president of the Northern Pacific Railroad Company, transmitted to the office of the Land Commissioner a map purporting to show the proposed general route of the Northern Pacific Railroad. Upon this map there appeared two lines from a point in the present State of North Dakota eastward, one terminating upon Lake Superior at or near Duluth, and the other extending into Wisconsin some distance south of Lake Superior, and terminating at the mouth of the Montreal River, this last named line being apparently partially obliterated by a wavy red line. This map was accompanied by a letter from Perham, stating that it shows the general line of the Northern Pacific Railroad from a point on Lake Superior in Wisconsin to a point on Puget's Sound. The Secretary of the Interior transmitted this map to the Land Commissioner, suggesting the withdrawal of the lands along the line, but the Land Commissioner soon afterward transmitted a letter to the Secretary of the Interior recommending that the map be rejected, for the reason that the same did not comply with the rules of the land department, which recommendation was approved by the Secretary. There is nothing to explain the apparent alteration of this map nor to show when it was made, and it is not shown that the directors of the company ever authorized the making or filing of the map, but it appears that the president of the company had no power to make or file it.

"By act approved May 5, 1864, c. 79, 13 Stat. 64, Congress granted ten sections of land per mile to the State of Minnesota

to aid in the construction of a railroad from St. Paul to Lake Superior. In the same year the legislature of Minnesota conferred this grant upon the Lake Superior and Mississippi Railroad Company, a Minnesota corporation, and afterwards known as the St. Paul and Duluth Railroad Company. On January 1, 1872, this company had constructed and was operating a railroad from St. Paul to Duluth, by way of Thomson Junction, which is upon the St. Louis River, and is the point from which the Northern Pacific Railroad Company started to build its line westward. On the last-named date the Northern Pacific Railroad Company purchased a one half interest in that part of this road, extending from Thomson Junction to Duluth, for the sum of $500,000, and received a deed therefor. On the same day the two companies made a written agreement providing for the operation of trains and the maintaining of the road. On May 1, 1872, the Northern Pacific Railroad Company and the Lake Superior and Mississippi Railroad Company made a further agreement, by which the lines of the Lake Superior and Mississippi Railroad were leased to the Northern Pacific Railroad for an annual rental, the land grant of the Lake Superior and Mississippi Railroad being expressly excepted from the operation of the lease. Pursuant to this lease the Northern Pacific Railroad Company operated the entire railroad thus leased, from May 1, 1872, until February 1, 1874, when it surrendered the lines leased and relinquished all its interest under the lease, but surrendered no rights under the deed. On the 12th of May, 1874, the Northern Pacific Railroad Company and the Lake Superior and Mississippi Company made an agreement for the operation of the line from Thomson Junction to Duluth.

"It further appears that, by act approved May 5, 1864, c. 80, 13 Stat. 66, the United States granted lands to the State of Wisconsin to aid in the construction of a railroad from Bayfield to Superior, but no road was constructed under this grant."

The Superior Court of Douglas County sustained the petition and appointed commissioners as prayed for. An appeal was taken to the Supreme Court of Wisconsin, which court, on June 23, 1898, reversed the order of the Superior Court, and remanded the cause to that court with directions to dismiss the

petition. *Northern Pacific Railway* v. *Doherty*, 100 Wisconsin, 39.

Thereupon the cause was brought here by a writ of error allowed by the Chief Justice of the Supreme Court of Wisconsin.

*Mr. C. W. Russell*, for the United States.

*Mr. M. S. Bright* for Doherty submitted on his brief.

*Mr. James B. Kerr* and *Mr. C. W. Bunn* for the Northern Pacific Railway Company.

MR. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

It is conceded that Doherty, the plaintiff in error, owns the southwest quarter of section 4, township 47 north, of range 11 west, in Douglas County, Wisconsin, having made a homestead entry thereof November 8, 1882, and obtained a patent therefor February 6, 1890.

The Northern Pacific Railway Company, the defendant in error, claims a right of way four hundred feet in width over and across this quarter section, and has constructed and is operating its railroad thereon. It is not claimed that this right of way was acquired by purchase or condemnation, but it is claimed by virtue of the terms of the act of Congress, approved July 2, 1864, c. 217, 13 Stat. 365, incorporating the Northern Pacific Railroad Company, and granting to it, among other rights and privileges, a right of way through the public lands of the United States. This act authorized the corporation, thereby created, to construct a railroad " beginning at a point on Lake Superior in the State of Minnesota or Wisconsin " westward to " some point on Puget's Sound," and the controlling question in this case is whether the eastern terminus of the railroad constructed under the act is at Duluth, Minnesota, or at Ashland, Wisconsin. If at Duluth, then the company acquired no right of way over any public land in Wisconsin; but if at Ashland, then it did acquire a right of way over public lands in Wisconsin, including the land in question.

It is conceded that on August 2, 1884, the directors of the Northern Pacific Railroad Company adopted a resolution fixing the eastern terminus of the railroad at Ashland; that this resolution was transmitted to the Commissioner of the General Land Office; that thereafter the Commissioner prepared a diagram showing the final eastern terminus of the line at Ashland, and sent the same to the district officers at Bayfield, Wisconsin, with instructions to adjust the grant on this basis; that a continuous line of railroad from Ashland to Puget's Sound in all respects in accordance with the act of incorporation, and as depicted upon its map of definite location has been constructed, and has been accepted as such by the President of the United States. Such concessions would seem to warrant a conclusion that the defendant in error is entitled, as matter of right, to maintain and operate its road upon a right of way over the land in dispute, and we are led to inquire why it is that such a conclusion is disputed.

And, first, it is claimed by the plaintiff in error that the Northern Pacific Railroad Company definitely located its eastern terminus at Duluth, January 1, 1872, when it purchased one half of the track and right of way of the Lake Superior and Mississippi Railroad Company from Thomson Junction to Duluth, and made a contract for operation of the line in common.

In reply to this claim the company denies that, by purchasing an interest in the line from Thomson Junction to Duluth, it was ever intended by the company to make Duluth the eastern terminus, or that the arrangement with the Lake Superior and Mississippi Railroad operated, as a matter of law, to fix and determine Duluth as the eastern terminus; and attention is called to the fact that it is provided in the act of July 2, 1864, that before the Northern Pacific Railroad Company could commence the construction of its road it should obtain the consent of the legislature of any State through which any portion of its line might pass. Such consent was obtained from the States of Wisconsin and Minnesota; and in the act of the latter State, granting consent, it was in terms provided " that should the company elect to make the eastern terminus of said line east of the eastern boundary of the State of Minnesota, then, and in

that case, they shall construct, or cause to be constructed, a line of railroad from the said main line to the navigable waters of Lake Superior, within the State of Minnesota, of the same gauge as said main line, for which purpose, the same powers, rights and privileges are hereby granted to said company as they have or may have to construct said main line in the State of Minnesota."

Evidently it was not intended by the legislature of Minnesota by this enactment to compel the railroad company to make its eastern terminus within the limits of that State. Indeed, the act recognizes the right of the company to elect to make its eastern terminus east of the limits of Minnesota.

It was, then, in compliance with the condition imposed by Minnesota, namely, that in case the railroad company elected to make its eastern terminus in Wisconsin, that the arrangement was made whereby the line from Thomson Junction on the main line to Duluth became, as to one half thereof, the property of the Northern Pacific Railroad Company.

We agree with the Supreme Court of Wisconsin in so regarding this transaction, and also in its holding that the arrangement between the Lake Superior and Mississippi Railroad Company and the Northern Pacific Railroad Company did not constitute a consolidation of the companies in any legal sense, so as to make the short line between Thomson Junction and Duluth a part of the trunk line contemplated by Congress.

When, in August, 1870, the company located its proposed general route, and when its map of such location was approved by the Secretary of the Interior, showing its eastern terminus to be in Wisconsin, it became obligatory on the company to comply with the condition imposed, in that event, to construct a branch line to Lake Superior within the limits of Minnesota, and hence the agreement with the Lake Superior and Mississippi Railroad Company.

It is next contended by the plaintiff in error that, even if Duluth is not to be regarded as the eastern terminus of the company's road, yet that when afterwards, in constructing its road eastward from Thomson Junction, the company's road reached the city of Superior, the latter thereby became the

point on Lake Superior which was to be regarded as the eastern terminus; that the city of Superior was the first point at which the Northern Pacific Railroad Company connected with Lake Superior by its own road, and it thereby became the initial point contemplated by the granting.act.

In connection with this proposition it is necessary to take notice of certain legislation of the State of Wisconsin.

By an act approved April 10, 1865, the legislature of that State gave its consent, unconditionally, to the Northern Pacific Railroad Company to build and maintain its road within the state limits. Stats. 1865, c. 465.

On March 25, 1872, the legislature passed an amending act, whereby the consent previously given to the Northern Pacific Railroad Company to construct and operate its road in the State of Wisconsin was made subject to certain conditions, among which were that the company should build and operate a line of railroad running from the junction of the said main line of the Northern Pacific Railroad Company with the Lake Superior and Minnesota Railroad to the bay of Superior, and should build and maintain at the latter point docks and piers suitable for the transfer of passengers and freight between the railroad and lake-going craft; and that until such connecting road and docks were constructed, it should not be lawful for the company to construct or maintain any other railroad in Wisconsin. Stat. 1872, c. 139.

To comply with this legislation it was necessary for the company to alter the line of its road as defined by its map of general route; so that the same might touch the lake at the bay of Superior. But it does not follow that thereby the company abandoned its right to itself select the point of its eastern terminus. This and the similar legislation of Minnesota were not intended or regarded as taking away from the company its rights and powers under the act of Congress. They only imposed, whether lawfully or otherwise, certain conditions respecting branch line connections which the legislatures deemed desirable for local advantage.

Some reliance is placed upon two decisions of the Secretary of the Interior—the first rendered November 13, 1895, and

reported in volume 21, Land Decisions, 412; the second, rendered August 27, 1896, and reported in volume 23, Land Decisions, 204.

Those decisions were made by the Secretary in disposing of a list of indemnity selections filed by the Northern Pacific Railway Company, based on losses of lands within the place limits lying east of the city of Superior. The opinion of the Secretary was that because the company was empowered to locate and construct a line of railroad from a point on Lake Superior to some point on Puget's Sound, it had authority to touch the lake at only one point, and that notwithstanding it filed a map of definite location from Thomson Junction to Ashland, the fact that the line so located and constructed touched the lake at the city of Superior precluded the company from extending its line eastward from that point. In his later decision the Secretary concluded that the transaction between the Lake Superior and Mississippi Railroad Company and the Northern Pacific Railroad Company was, in legal effect, a consolidation of the two corporations, and that, therefore, the eastern terminus of the Northern Pacific Railroad was definitely fixed at Duluth.

We do not care to repeat the considerations already advanced going to show that, in our opinion, the right of the railroad company, under the act of July 2, 1864, to select its eastern terminus at a point on Lake Superior in the State of Minnesota or Wisconsin, was not intentionally, or by operation of law, ended or determined by the company's compliance with the conditions sought to be imposed by the legislation of Minnesota and Wisconsin. The views of the Supreme Court of Wisconsin on this subject may be properly quoted: "On March 6, 1865, one Josiah Perham, then president of the Northern Pacific Railroad Company, filed with the Secretary of the Interior a map showing a proposed route of the proposed railroad. On this map appear two lines from a point in North Dakota to Lake Superior, one ending at Duluth and one at the mouth of the Montreal River. The latter line is partially obliterated by a wavy red line through its whole length. It appears affirmatively that the president had no authority to make or file this

map, and that the directors never authorized it; and further, that on June 22, 1865, the map was rejected by the Land Commissioner and by the Secretary of the Interior because it did not comply with the rules and regulations of the land department. No further action was ever taken upon it, and it seems too plain to require argument that it can cut no figure in the case. All the subsequent maps made and filed by the corporation, as well as its recorded acts, show the clear intention to make the eastern terminus of the road in Wisconsin. In 1870 a map of general route was filed, showing the eastern terminus to be at the mouth of the Montreal River; upon receipt of which the odd-numbered sections of land within twenty miles of the line were withdrawn from sale, homestead and pre-emption entry in the States of Minnesota and Wisconsin, and the price of land in the even-numbered sections was raised to $2.50 per acre, and large quantities sold by the United States at that price. In 1882 a map of definite location of the line from Thomson Junction eastward to a point in section 15, township 47, range 2 west of the fourth P. M., was filed in the land office at Washington. This line passed through Ashland and terminated a few miles east of that city. This map was approved, and the land grant adjusted in accordance therewith by the department. In August, 1884, the board of directors of the company, by formal resolution, fixed the eastern terminus of the road at Ashland, and a certified copy of the resolution was filed in the General Land Office in December, 1884, whereupon the Land Commissioner made a diagram showing the eastern terminus so fixed, and adjusted the grant in accordance therewith.

"The portion of the road extending eastward from Thomson Junction to Ashland was constructed in the years 1881, 1882, 1883 and 1884, and was examined in three sections by commissioners appointed by the President of the United States, as provided by the act of incorporation. The commissioners reported favorably upon all of these sections, and their recommendations were approved by the President, the last approval being dated February 6, 1885.

"All of these deliberate acts of the department and executive

officers are brushed aside by Commissioner Smith on the ground that the terminus of the road had been unalterably fixed at Duluth by the action of the Northern Pacific Railroad Company in 1872. As we do not agree with the Commissioner's premise we cannot agree with his conclusion, and therefore hold that the terminus of the road is at Ashland, and hence that the railroad company had a right of way across the petitioner's land by virtue of the provisions of the act of incorporation." *Northern Pacific Railway Company* v. *Doherty*, 100 Wisconsin, 39.

In a bill filed in the Circuit Court of the United States for the District of Minnesota by the United States against the Northern Pacific Railroad Company, the Northern Pacific Railway Company and others, it was sought to have cancelled and annulled a patent granted by the United States, on April 22, 1895, to the Northern Pacific Railroad Company, for lot 5 of section 29, township 54 north, of range 13 west, in the county of St. Louis and State of Minnesota, a tract of land situated more than ten miles east of Duluth, which the bill averred to be the eastern terminus or eastern initial point of the grant to the Northern Pacific Railroad Company by the act of July 2, 1864. The bill alleged that the patent had been granted through inadvertence and mistake, and under an " erroneous impression and mistaken belief that said tract of land was lying and being within the limits of the aforesaid grant to the Northern Pacific Railroad Company."

The case was so proceeded in, on bill, answer and an agreed statement of facts, that on February 20, 1899, the bill of complainant was dismissed for want of equity; and this decree was, on appeal to the Circuit Court of Appeals for the Eighth Circuit, on July 10, 1899, by that court affirmed. *United States* v. *Northern Pac. R. Co.*, 95 Fed. Rep. 864.

The controversy in that case involved the same questions as those we have been considering in the present case of Doherty, and the conclusions reached were that the land department committed no error of law when it held that the Northern Pacific Railroad Company had authority under its charter to locate its eastern terminus at Ashland, and made no mistake of fact when it found that the Northern Pacific Railroad Company

had actually selected Ashland as its eastern terminus. The facts and reasoning relied on by the respective parties were, in the main, the same with those that were relied on in the case in the Supreme Court of Wisconsin, now under review in this court.

The judgment of the Supreme Court of Wisconsin is

*Affirmed.*

MR. JUSTICE MCKENNA did not take part in the decision of the case.