# ALLEGHENY PITTSBURGH COAL CO. *v.* COUNTY COMMISSION OF WEBSTER COUNTY, WEST VIRGINIA

No. 87–1303.   Argued December 7, 1988—Decided January 18, 1989*

*Together with No. 87–1310, *East Kentucky Energy Corp. et al.* v. *County Commission of Webster County, West Virginia*, also on certiorari to the same court.

*E. Barrett Prettyman, Jr.*, argued the cause for petitioners in both cases. With him on the briefs were *John G. Roberts, Jr.*, and *William James Murphy*.

*C. William Ullrich*, Chief Deputy Attorney General of West Virginia, argued the cause for respondent. With him on the brief were *Charles G. Brown*, Attorney General, and *Jack Alsop.*†

---

†Briefs of *amici curiae* urging reversal were filed for the National Association of Realtors by *Laurene K. Janik;* and for the National Taxpayers Union by *Gale A. Norton*.

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

The West Virginia Constitution guarantees to its citizens that, with certain exceptions, "taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its value . . . ." Art. X, § 1. The Webster County tax assessor valued petitioners' real property on the basis of its recent purchase price, but made only minor modifications in the assessments of land which had not been recently sold. This practice resulted in gross disparities in the assessed value of generally comparable property, and we hold that it denied petitioners the equal protection of the laws guaranteed to them by the Fourteenth Amendment.

Between 1975 and 1986, the tax assessor for Webster County, West Virginia, fixed yearly assessments for property within the county at 50% of appraised value. She fixed the appraised value at the declared consideration at which the property last sold. Some adjustments were made in the assessments of properties that had not been recently sold, although they amounted to, at most, 10% increases in 1976, 1981, and 1983 respectively.[1]

---

Benna Ruth Solomon and Eugene J. Comey filed a brief for the National Association of Counties et al. as amici curiae urging affirmance.

Briefs of amici curiae were filed for the Pacific Legal Foundation et al. by Ronald A. Zumbrun, Anthony T. Caso, and Jonathan M. Coupal; and for the International Association of Assessing Officers by James F. Gossett.

[1] Petitioners contend that the adjustments to the assessments for property not recently transferred were uneven at best. According to petitioners, a study of the assessed value of all coal tracts in Webster County from 1983 to 1984 was introduced at trial and demonstrated that the assessment of 35% of the tracts was unchanged during that period. The courts below do not appear to have made specific factual findings accepting or rejecting this study or petitioners' conclusions drawn from it. For the purposes of argument, we will accept the county's figures since we find that, even accepting those figures, the adjustments do not dispel the constitutional flaw in the assessment system.

In 1974, for example, Allegheny Pittsburgh Coal Company (Allegheny) purchased fee, surface, and mineral interests in certain properties for a stated price somewhat in excess of $24 million, and during the tax years 1976 through 1983 its property was assessed annually at half of this figure. In 1982 Allegheny sold the property to East Kentucky Energy Corp. (Kentucky Energy) for a figure of nearly $30 million, and the property thereafter was annually assessed at a valuation just below $15 million. Oneida Coal Company and Shamrock Coal Company participated in similar transactions in Webster County, and the property they purchased or sold was assessed in a similar manner.

Each year, petitioners pursued relief before the County Commission of Webster County sitting as a review board. They argued that the assessment policy of the Webster County assessor systematically resulted in appraisals for their property that were excessive compared to the appraised value of similar parcels that had not been recently conveyed. Each year the county commission affirmed the assessments, and each year petitioners appealed to the State Circuit Court. A group of these appeals from Allegheny and its successor in interest, Kentucky Energy, were consolidated by the West Virginia Circuit Court and finally decided in 1985. App. to Pet. for Cert. in No. 87–1303, p. 15a. Another group of appeals from Shamrock and Oneida were consolidated and decided by the West Virginia Circuit Court early the next year. App. to Pet. for Cert. in No. 87–1310, p. 49a.[2]

The judge in both of these cases concluded that the system of real property assessment used by the Webster County assessor systematically and intentionally discriminated against

---

[2] After each of these primary decisions adjudicating the validity of the assessments to the lands in question, petitioners obtained a number of other orders applying the findings in the primary decisions to their specific cases and to other appeals not consolidated in the primary decisions. See App. to Pet. for Cert. in No. 87–1310, pp. 79a, 83a, and 86a.

petitioners in violation of the West Virginia Constitution and the Fourteenth Amendment's Equal Protection Clause. He ordered the county commission to reduce the assessments on petitioners' property to the levels recommended by the state tax commissioner in his valuation guidelines published for use by local assessors. Underlying the judge's conclusions were findings that petitioners' tax assessments over the years were dramatically in excess of those for comparable property in the county. He found that "the assessor did not compare the various features of the real estate to which the high assessment was applied with the various features of land assessed at a much lower rate." App. to Pet. for Cert. in No. 87–1303, p. 29a; App. to Pet. for Cert. in No. 87–1310, p. 59a. "The questioned assessments were not based upon the presence of economically minable or removable coal, oil, gas or harvestable timber in or upon petitioners' real estate, as compared to an absence of the same in or upon [neighboring] properties." *Ibid.* Nor were they "based upon present use or immediately foreseeable economic development of petitioners' real estate." *Ibid.* Rather, "[t]he sole basis of the assessment of petitioners' real estate was, according to the assessor, the consideration declared in petitioners' deeds." *Ibid.*[3]

---

[3] Respondent argues in this Court that petitioners' land was not truly comparable to that of the surrounding properties. It points to the fact that one of the parcels held by Allegheny, and then by Kentucky Energy, comprising 4,287 acres, allegedly contains 32 million tons of low-sulfur coal recoverable by strip mining. This unusually valuable parcel skews the average value of all the properties, as well as serving as a basis for higher valuation of this parcel than those surrounding it.

Petitioners make a number of answers: First, they rely on respondent's stipulations that "[t]he properties surrounding the property owned by . . . Petitioner, . . . are comparable properties in that they are substantially the same geologically as the properties of the Petitioner . . . ." Record 1319–1320, 1085. Next, they point to the factual findings of the West Virginia Circuit Court, never rejected by the West Virginia Supreme Court of Appeals, that "[a]lthough the real estate of each of these petitioners is not identical to that of all other real estate in Webster County, it

This approach systematically produced dramatic differences in valuation between petitioners' recently transferred property and otherwise comparable surrounding land. For the years 1976 through 1982, Allegheny was assessed and taxed at approximately 35 times the rate applied to owners of comparable properties. After purchasing that land, Kentucky Energy was assessed and taxed at approximately 33 times the rate of similar parcels. From 1981 through 1985, the county assessed and taxed the Shamrock-Oneida property at roughly 8 to 20 times that of comparable neighboring coal tracts. These disparities existed notwithstanding the adjustments made to the assessments of land not recently conveyed. In the case of the property held by Allegheny and Kentucky Energy, the county's adjustment policy

---

appears that petitioners' real estate is substantially similar to the real estate of the others in topography, location, access, development, mineral content and forestation, and that the petitioners' real estate is substantially similar to adjacent and contiguous tracts and parcels of real estate owned by others." App. to Pet. for Cert. in No. 87–1303, p. 16a; App. to Pet. for Cert. in No. 87–1310, p. 50a. Finally, they note that the court's findings were founded on the testimony of Kentucky Energy's expert witness, the one who testified to the estimated 32 million tons of coal under Kentucky Energy's land, that the surrounding properties were equally promising. On direct examination he said:

"As far as comparing this area with the surrounding property, geologically, those same seams are present on all the other properties [suggested as comparable]. The same coal seams are present there. . . . [T]he coal is there and I know that the chances of them being mineable are just as good there as they are on the [Kentucky Energy] properties.

. . . . .

". . . There may be some variations, depending on which individual seam is mineable from one property to the other, but in the long run they are very similar properties located within the same area and there is no geological reason that they should not be comparable." Brief in Opposition in No. 87–1303, pp. 10a–11a.

We think that petitioners' submissions justify the conclusion on the record presented to us that their properties were, in aspects relevant to valuation and assessment, comparable to surrounding property valued and assessed at markedly lower amounts.

would have required more than 500 years to equalize the assessments.

On appeal, the Supreme Court of Appeals of West Virginia reversed. It found that the record did not support the trial court's ruling that the actions of the assessor and board of review constituted "intentional and systematic" discrimination. It held that "assessments based upon the price paid for the property in arm's length transactions are an appropriate measure of the 'true and actual value' of . . . property." *In re 1975 Tax Assessments against Oneida Coal Co.*, —— W. Va. ——, ——, 360 S. E. 2d 560, 564 (1987). That other properties might be undervalued relative to petitioners' did not require that petitioners' assessments be reduced: "'Instead, they should seek to have the assessments of other taxpayers raised to market value.'" *Id.*, at ——, 360 S. E. 2d, at 565 (quoting *Killen* v. *Logan County Comm'n*, —— W. Va. ——, ——, 295 S. E. 2d 689, 709 (1982)). We granted certiorari to decide whether these Webster County tax assessments denied petitioners the equal protection of the law and, if so, whether petitioners could constitutionally be limited to the remedy of seeking to raise the assessments of others. 485 U. S. 976 (1988).

We agree with the import of the opinion of the Supreme Court of Appeals of West Virginia that petitioners have no constitutional complaint simply because their property is assessed for real property tax purposes at a figure equal to 50% of the price paid for it at a recent arm's-length transaction. But their complaint is a comparative one: while their property is assessed at 50% of what is roughly its current value, neighboring comparable property which has not been recently sold is assessed at only a minor fraction of that figure. We do not understand the West Virginia Supreme Court of Appeals to have disputed this fact. We read its opinion as saying that even if there is a constitutional violation on these facts, the only remedy available to petitioners was an effort to have the assessments on the neighboring properties raised

by an appropriate amount. We hold that the assessments on petitioners' property in this case violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and that petitioners may not be remitted to the remedy specified by the Supreme Court of Appeals of West Virginia.

The county argues that its assessment scheme is rationally related to its purpose of assessing properties at true current value: when available, it makes use of exceedingly accurate information about the market value of a property—the price at which it was recently purchased. As those data grow stale, it periodically adjusts the assessment based on some perception of the general change in area property values. We do not intend to cast doubt upon the theoretical basis of such a scheme. That two methods are used to assess property in the same class is, without more, of no constitutional moment. The Equal Protection Clause "applies only to taxation which in fact bears unequally on persons or property of the same class." *Charleston Fed. Savings & Loan Assn.* v. *Alderson*, 324 U. S. 182, 190 (1945) (collecting cases). The use of a general adjustment as a transitional substitute for an individual reappraisal violates no constitutional command. As long as general adjustments are accurate enough over a short period of time to equalize the differences in proportion between the assessments of a class of property holders, the Equal Protection Clause is satisfied. Just as that Clause tolerates occasional errors of state law or mistakes in judgment when valuing property for tax purposes, see *Sunday Lake Iron Co.* v. *Wakefield*, 247 U. S. 350, 353 (1918); *Coulter* v. *Louisville & Nashville R. Co.*, 196 U. S. 599 (1905), it does not require immediate general adjustment on the basis of the latest market developments. In each case, the constitutional requirement is the seasonable attainment of a rough equality in tax treatment of similarly situated property owners. *Allied Stores of Ohio* v. *Bowers*, 358 U. S. 522, 526–527 (1959), and cases there cited; cf. *FPC* v. *Hope Natural Gas*

*Co.*, 320 U. S. 591, 602 (1944) (noting, in the ratemaking context, that "[i]t is not theory, but the impact . . . that counts").

But the present action is not an example of transitional delay in adjustment of assessed value resulting in inequalities in assessments of comparable property. Petitioners' property has been assessed at roughly 8 to 35 times more than comparable neighboring property, and these discrepancies have continued for more than 10 years with little change. The county's adjustments to the assessments of property not recently sold are too small to seasonably dissipate the remaining disparity between these assessments and the assessments based on a recent purchase price.

The States, of course, have broad powers to impose and collect taxes. A State may divide different kinds of property into classes and assign to each class a different tax burden so long as those divisions and burdens are reasonable. *Allied Stores, supra*, at 526–527 ("The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products"). It might, for example, decide to tax property held by corporations, including petitioners, at a different rate than property held by individuals. See *Lehnhausen* v. *Lake Shore Auto Parts Co.*, 410 U. S. 356 (1973) (Illinois *ad valorem* tax on personalty of corporations). In each case, "[i]f the selection or classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law." *Brown-Forman Co.* v. *Kentucky*, 217 U. S. 563, 573 (1910).[4]

---

[4] We need not and do not decide today whether the Webster County assessment method would stand on a different footing if it were the law of a State, generally applied, instead of the aberrational enforcement policy it appears to be. The State of California has adopted a similar policy as Article XIIIA of its Constitution, popularly known as "Proposition 13." Proposition 13 generally provides that property will be assessed at its 1975–1976 value, and reassessed only when transferred or constructed upon, or in a limited manner for inflation. Cal. Const., Art. XIIIA, §2 (limiting

But West Virginia has not drawn such a distinction. Its Constitution and laws provide that all property of the kind held by petitioners shall be taxed at a rate uniform throughout the State according to its estimated market value. There is no suggestion in the opinion of the Supreme Court of Appeals of West Virginia, or from any other authoritative source, that the State may have adopted a different system in practice from that specified by statute; we have held that such a system may be valid so long as the implicit policy is applied evenhandedly to all similarly situated property within the State. *Nashville C. & S. L. R. Co.* v. *Browning,* 310 U. S. 362, 368–369 (1940). We are not advised of any West Virginia statute or practice which authorizes individual counties of the State to fashion their own substantive assessment policies independently of state statute. See *Salsburg* v. *Maryland,* 346 U. S. 545 (1954). The Webster County assessor has, apparently on her own initiative, applied the tax laws of West Virginia in the manner heretofore described, with the resulting disparity in assessed value of similar property. Indeed, her practice seems contrary to that of the guide published by the West Virginia Tax Commission as an aid to local assessors in the assessment of real property.

"[I]ntentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property." *Sunday Lake Iron Co., supra,* at 352–353; *Sioux City Bridge Co.* v. *Dakota County,* 260 U. S. 441, 445–446 (1923); *Cumberland Coal Co.* v. *Board of Revision of Tax Assessments in Greene County, Pa.,* 284 U. S. 23, 28–29 (1931). "The equal protection clause . . . protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class." *Hillsborough* v. *Cromwell,* 326

---

inflation adjustments to 2% per year). The system is grounded on the belief that taxes should be based on the original cost of property and should not tax unrealized paper gains in the value of the property.

U. S. 620, 623 (1946). We have no doubt that petitioners have suffered from such "intentional systematic undervaluation by state officials" of comparable property in Webster County. Viewed in isolation, the assessments for petitioners' property may fully comply with West Virginia law. But the fairness of one's allocable share of the total property tax burden can only be meaningfully evaluated by comparison with the share of others similarly situated relative to their property holdings. The relative undervaluation of comparable property in Webster County over time therefore denies petitioners the equal protection of the law.

A taxpayer in this situation may not be remitted by the State to the remedy of seeking to have the assessments of the undervalued property raised. "The [Equal Protection Clause] is not satisfied if a State does not itself remove the discrimination, but imposes on him against whom the discrimination has been directed the burden of seeking an upward revision of the taxes of other members of the class." *Hillsborough, supra,* at 623, citing *Sioux City Bridge Co., supra,* 445–447; *Iowa-Des Moines Nat'l Bank* v. *Bennett,* 284 U. S. 239, 247 (1931); *Cumberland Coal Co., supra,* at 28–29. The judgment of the Supreme Court of Appeals of West Virginia is accordingly reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*